(No. 35199.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BILLY LEE LOBB, Plaintiff in Error.

*Opinion filed September 24, 1959.*

ALBERT E. HURT, of Decatur, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and HILMER C. LANDHOLT, State's Attorney, of Decatur, (FRED G. LEACH and WILLIAM H. SOUTH, Assistant Attorneys General, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

The defendant, Billy Lee Lobb, and Richard Allen, were jointly indicted for the burglary of a building known as the Night Owl Bar-B-Q located south of the city of Macon. The building was owned by Dell Carroll. Allen was separately tried by a jury, found guilty and sentenced to the penitentiary. His conviction was affirmed in *People v. Allen, ante,* p. 55.

Defendant Lobb was also tried by a jury which returned a guilty verdict, and he was sentenced to the penitentiary for a term of not less than five nor more than twenty years. By this writ of error he urges that the evidence did not establish his guilt beyond a reasonable doubt; that the trial

court erred in admitting certain evidence; that the court erred in instructing the jury; and that the State's Attorney made improper remarks in argument. He also challenges the constitutionality of Supreme Court Rule 24—1.

The testimony of Dell Carroll and his manager was substantially the same at the trial of both Allen and Lobb. An adequate summary, except for the facts stated hereafter, will be found in *Allen,* and will not be repeated here.

Carroll further testified that when he arrived at the tavern he stationed himself near a small ditch at a point about 60 to 70 feet from the west door of the tavern. At that time, a two-bulb light, 20 feet high, located on a pole about 8 feet from the door, was burning. In addition, there were six or seven lights illuminating the interior of the building. A pane of clear glass, covered by a venetian blind, was in the upper portion of the inner door of this entrance, and the adjoining wooden storm door enclosed ten sections of glass which were horizontally and vertically separated by supporting panels. As Carroll looked toward the door, he could see two men inside the building who tore the venetian blind from the inner door. One man was short and stocky and the other, who pried on the lock and the door with a yellow-handled screwdriver, was tall.

After working for about five minutes, the tall man, whom Carroll identified as the defendant Lobb, broke the the lock, removed the inner bar and opened the door. Allen, who Carroll identified as the short and stocky man, came out of the building closely followed by Lobb. Carroll shouted "halt," and then shot both men with a shotgun. They were hit but continued to run and he lost sight of them temporarily. Carroll saw Lobb again when he emerged from behind a building and turned to go east. Carroll fired again when Lobb disregarded his order to halt, and Lobb ran across the road and into an alfalfa field about 150 feet to the north. Carroll noticed that Lobb was wearing gloves.

Later, a jacket, a pair of brown gloves and a yellow-handled screwdriver were found in the alfalfa field.

Clara Tomlinson, a widow who lived on a farm about three quarters of a mile from the Night-Owl Bar-B-Q and tavern, appeared as a witness for the People. She testified that during the early morning hours of August 25, 1957, she heard her dog bark and got up to investigate. After turning on an outside light she saw nothing, so returned to bed. Sometime after daylight, the defendant Lobb appeared at her back door and asked if her husband was home. When she told him her husband was dead, he tried to open the door, but was unable to do so because it was locked. Defendant was then dirty and wet, and blood was on his clothing. He requested a drink of water. She called her grandsons and when they came to the kitchen, she handed him a glass and told him to go to the outside pump. Later he told her that he had been hitchhiking through Macon and had been let out of a car near the tavern; that he went to the front door and, finding no one there, then went around to the back door where someone shot him. He asked her to take him some place for help. She refused, but called Bob Timmons, a deputy sheriff, who picked up Lobb.

Lobb testified that he had been drinking with Allen and others at a tavern in Decatur during the evening of August 24, 1957, and that sometime between 11:30 and 12:30, Marilyn Dodson, a friend, drove him to his home. She entered the house but he remained in the car where he fell asleep. Allen appeared and suggested that they find a poker game. They got into Allen's car and, after visiting a local hotel and finding no game in progress, Allen suggested that they might find a game in Macon. Lobb protested that he was tired but finally consented to go. When they arrived in Macon, they drove directly to the Night Owl tavern where Allen parked his Plymouth automobile behind the

motel which was then under construction. After observing lights near some cabins, Allen stated that he "guessed this was the place," and left the car, but Lobb remained there to rest.

After Allen had been gone for 20 or 30 minutes, Lobb testified that he became worried and went to one of the cabins where he knocked on the door, but received no answer. After remaining there for about eight minutes, he walked toward the tavern. At that time a car drove up, an armed man got out of it, and they met as Lobb came around the back of the car. The shotgun which the man carried was pointed directly at Lobb who raised his hands and started to ask the man not to shoot, when the gun was discharged, striking Lobb in the stomach. Lobb stated that he then heard a sound behind him like that of glass breaking; that simultaneously the tavern door swung open, striking him in the back, and Allen rushed out; that both men were struck by shots fired at this time; and that the witness was walking away "at a trot" when he was shot the third time.

After he got across the road and into a ditch, Allen came to him and asked how badly he was hurt. He testified that he asked Allen why he entered the place, but Allen made no reply. Allen then told Lobb he was going to get help and left. With the aid of a board which he used as a crutch, Lobb then crossed the fields to the Tomlinson barn, where he took refuge.

Lobb further testified that after daylight he went to the house and asked the lady there to call his mother, but she refused; that she gave him a glass, after which he went to the well and got a drink; that she then stated she would call a man she knew; and that deputy sheriff Timmons soon appeared and took him to the hospital. The defendant admitted he had worn the jacket which was found in the field on the night in question, but when shown the gloves and screwdriver, he stated that he had never seen them be-

fore, "that he knew of." He denied that he had been inside the tavern and denied any knowledge of Allen's intention to commit a burglary. He did not deny telling Mrs. Tomlinson that he had been hitchhiking just prior to the shooting.

On cross-examination, defendant admitted that he, Allen and Marilyn Dodson left the State together on October 28, 1957, after his arraignment on the criminal charge. He claimed that this was Allen's idea and that he left because he was afraid of him. He further testified that they had been together in California and had later traveled with the same carnival. From defendant's own admissions, the testimony of the sheriff, and the documentary evidence introduced, it appears that defendant left the jurisdiction while out on bail on the charge of burglary, and that his bond was forfeited. He was apprehended in Kansas and returned to Illinois by the sheriff to stand trial.

The sheriff testified that on the return trip he discussed the case with defendant and that defendant stated, among other things, that as he and Allen emerged from the door Carroll "just kept shooting at us." Lobb denied having made such a statement.

In urging that the evidence does not establish his guilt beyond a reasonable doubt, defendant takes the position that his conviction rests entirely upon the testimony of Carroll and that Carroll's testimony is unworthy of belief. Neither of these propositions is supported by the record. While Carroll's positive identification of Lobb as one of the men he saw inside the building was compelling, it by no means constituted the only evidence to connect the defendant with the crime. The gloves, yellow-handled screwdriver and jacket, found in the alfalfa field to which the defendant admits he fled immediately following the shooting, are strongly corroborative of Carroll's statement that defendant wore gloves and carried such screwdriver. While defendant denied ever seeing the gloves or screwdriver prior to the trial, he admitted wearing the jacket which was found

in the same area. It is undisputed that two bottles of whiskey were taken from the tavern and two bottles of the same brand were found in the Plymouth automobile in which defendant admits he was a passenger. Defendant's flight to avoid prosecution is another circumstance indicative of his guilt.

The testimony of Mrs. Tomlinson is also corroborative of the proof of defendant's guilt beyond a reasonable doubt. If defendant was innocently decoyed to the scene of a burglary by Allen, as he would now have us believe, then there was no reason why he should tell the witness he had been hitchhiking just prior to the time he was shot. If true, either version of the reason for his presence at the tavern would be consistent with his claim of innocence. However, both cannot be true, and the fact that he made statements at the trial inconsistent with those made outside of court weighs heavily against him. When a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbabilities. *People* v. *Malmenato*, 14 Ill.2d 52; *People* v. *Meyers*, 412 Ill. 136.

On review in a criminal cause, this court will not reverse a judgment of conviction unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of defendant's guilt. (*People* v. *Townsend*, 11 Ill.2d 30; *People* v. *Prohaska*, 8 Ill.2d 579.) Where the evidence is conflicting, the credibility of the witnesses and the weight to be given their testimony is a question for the jury or for the trial court, if the case is tried without a jury, and this court will not substitute its judgment for that of the jury or trial court. (*People* v. *Hinderhan*, 405 Ill. 435; *People* v. *Smith*, 391 Ill. 172.) We are satisfied that the evidence establishes the guilt of the defendant beyond a reasonable doubt and the judgment must be affirmed unless substantial prejudicial error occurred during the trial.

Errors assigned upon the admission of evidence all relate to certain photographs of the building and doors of the Night Owl Bar-B-Q and tavern. It is contended that these are posed photographs which unduly emphasize certain features; and that they do not portray conditions which existed at the time of the burglary. The same objections were raised to the same pictures in *Allen*. The determination of admissibility there made is adequate for present purposes without further discussion, except to note that in most instances the objections offered were general only; that all witnesses testified that the pictures correctly portrayed what they purported to show; and that sufficient foundation was laid for their admission. This assignment of error is without merit.

At the request of the People, the court gave an instruction concerning flight which advised the jury that it was a circumstance to be considered in determining the guilt or innocence of the defendant, and refused an instruction upon the same general subject tendered by the defendant. Error is assigned in the giving and refusal of these instructions. The record shows that a conference on instructions was had pursuant to section 67 of the Civil Practice Act with reference to the instruction which was given for the People. (Ill. Rev. Stat. 1957, chap. 110, par. 67.) Counsel for defendant then affirmatively stated that he had no objection to the giving of the instruction in question and first raised this objection in the motion for a new trial. We will consider this assignment of error without determining whether defendant, by his conduct at the conference, waived the right to object to the propriety of the given instruction.

In *People* v. *Weber*, 401 Ill. 584, we approved an identical instruction. It is the settled law of this State that the fact of flight is a circumstance which may be considered by the jury, in connection with all the other evidence in the case, as tending to prove guilt. (*People* v. *Dukes*, 12 Ill.2d 334; *People* v. *Gibson*, 385 Ill. 371; *People* v.

*Schaffner,* 382 Ill. 266.) The instruction was applicable under the facts adduced at the trial, correctly stated the law, and was properly given.

Defendant's refused instruction told the jury, in substance, that the fact of flight was not proof of guilt but a circumstance to be considered and "it is for the jury to decide from all the evidence whether the evidence of flight is consistent with his innocence." No case is cited in which this instruction has been approved, or failure to give it held to be error. It was repetitive of part of the People's given instruction and we believe that the quoted language renders it argumentative, ambiguous and objectionable. The trial court did not err in refusing the instruction.

In closing argument the State's Attorney, in commenting on the probable effect of a shotgun blast at close range, said: "I don't know which one's of you were on that Bilby trial, but you know from ordinary experience—." Defense counsel immediately objected, the objection was sustained, and the court instructed the jury to disregard the remark. While it was improper to refer to another case on which some of the jurors may have served, we fail to see how the defendant was prejudiced by comment upon the destructive possibilities of a shotgun blast in view of the testimony of defendant concerning the shooting and that of Carroll relative to where defendant was standing at the time he was first shot. Unless the remarks were injurious to the defendant or produced a result which otherwise would not have been reached, we will not reverse on that ground alone. (*People* v. *Jenko,* 410 Ill. 478; *Gallagher* v. *People,* 211 Ill. 158; *Siebert* v. *People,* 143 Ill. 571.) The remarks in question do not require a reversal in this case.

The jury in this case was selected pursuant to Supreme Court Rule 24—1 which provides: "The judge shall initiate the *voir dire* examination of jurors in civil and criminal causes by identifying the parties and their respective counsel and he shall briefly outline the nature of the case. The

judge shall then put to the jurors any questions which he thinks necessary, touching their qualifications to serve as jurors in the cause on trial. The parties or their attorneys shall be allowed a reasonable opportunity to supplement such examination, but shall not directly or indirectly examine jurors concerning matters of law or instructions."

The record shows that the trial judge, after stating the nature of the case, identifying the parties and their counsel, examined the jurors and thoroughly explored the possible grounds of challenge for cause and elicited information which might be of assistance in the intelligent exercise of a peremptory challenge. As a result, when the jurors were tendered to respective counsel for further examination, few questions were asked and in most instances peremptory challenges were exercised both by the State's Attorney and counsel for defendant without further interrogation. This was especially true with reference to counsel for defendant, who, though given opportunity for further examination, found it necessary to ask only about a dozen questions during the selection of the jury. He freely exercised his right to challenge peremptorily, but exhausted only 13 out of the 20 peremptory challenges to which defendant was entitled. Ill. Rev. Stat. 1955, chap. 38, par. 742.

Defendant challenges the procedure used in selecting the jury without pointing out specifically how he was prejudiced thereby. He makes no claim here that the jurors or any of them were biased or prejudiced or that the manner of selection failed to secure a fair and impartial jury. He fails to point out how his right to examine prospective jurors was in any way curtailed or denied except for the court's refusal early in the examination to permit him to interrogate a juror on a question of law. While his contentions pertaining to the invalidity of the rule are vague, his theory seems to be that it is unconstitutional *per se* without regard to its effect or operation in a particular case.

At the trial, defendant's counsel objected by stating that

the method being used was "unconstitutional and invalid." It is here contended that the rule violates "due process" within the proscription of the fifth amendment to the United States constitution and that it denies his right to a jury trial as guaranteed by sections 5 and 9 of article II of the Illinois constitution.

The fifth amendment to the constitution of the United States has no application here. As a part of the original Bill of Rights, its provisions operate only as a limitation on the exercise of the powers of the Federal government and not on those of the respective States. *People* v. *O'Connor*, 4 Ill.2d 403; *Adamson* v. *California*, 332 U.S. 46, 91 L. ed. 1903; *Brown* v. *New Jersey*, 175 U.S. 172, 44 L. ed. 119; *Ex Parte Spies*, 123 U. S. 131, 31 L. ed. 80; *Barron* v. *Mayor and Council of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L. ed. 672.

Section 5 of article II of the Illinois constitution provides that "The right of trial by jury as heretofore enjoyed, shall remain inviolate." We have construed these words to mean the right of a trial by jury as it existed under the common law and as enjoyed at the time of the adoption of the respective Illinois constitutions. (*Reese* v. *Laymon*, 2 Ill.2d 614; *People* v. *Bruner*, 343 Ill. 146.) The right of trial by jury as it existed at common law is the right to have the facts in controversy determined, under the direction and superintendence of a judge, by the unanimous verdict of twelve impartial jurors who possess the qualifications and are selected in the manner prescribed by law. *People* v. *Kelly*, 347 Ill. 221; *Liska* v. *Chicago Railways Co.* 318 Ill. 570.

Section 9 of article II provides that "In all criminal prosecutions the accused shall have the right to * * * a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." Neither of these sections of article II mean that any other mode of trial is prohibited or that the right may

not be waived. These provisions and the similar guarantees of the United States constitution refer to the form and manner of trial; they are not jurisdictional. A court is fully organized and competent for the transaction of business without the presence of a jury. *People ex rel. Swanson* v. *Fisher*, 340 Ill. 250; *Patton* v. *United States*, 281 U.S. 276, 74 L. ed. 854; *Schick* v. *United States*, 195 U.S. 65, 49 L. ed. 99.

The constitutional guarantee of the right of trial by jury is not so inelastic as to render unchangeable every characteristic and specification of the common-law jury system. Flexibility for the adjustment of details remains, as long as the essentials of the system are retained. *People* v. *Izzo*, 14 Ill.2d 203; *Olson* v. *Chicago Transit Authority*, 1 Ill.2d 83; *People* v. *Kelly*, 347 Ill. 221.

This court has inherent power to make rules governing the practice in inferior courts. This includes the regulation of jury trials in criminal cases. (*People* v. *Callopy*, 358 Ill. 11.) The inherent power of courts to make suitable rules consistent with constitutional safeguards is universally recognized. (14 Am. Jur. page 355, par. 151.) Such rules are adopted to facilitate the work of the court and have the force of law. *Harris* v. *Annunzio*, 411 Ill. 124; *People ex rel. Rose* v. *Craig*, 404 Ill. 505.

In adopting Rule 24—1, this court sought to expedite jury trials in a manner consistent with the thorough protection of the rights and interests of the litigants. The evils attendant upon a lengthy and unrestricted *voir dire* examination of jurors have long been recognized. In *Pennsylvania Co.* v. *Rudel*, 100 Ill. 603, 608, decided in 1881, we stated: "The unnecessary protraction of jury trials has come to be a great evil, and one thing which contributes thereto is the needlessly long drawn out examination of jurors." We further commented on this condition in *Mithen* v. *Jeffery*, 259 Ill. 372, 376, in 1913, and stated: "There is a further objection that the interminable exam-

ination of jurors, so often made as to different individuals and every conceivable relation to them, should not be indulged in."

We recognize that some form of *voir dire* examination is necessary to enable the parties to secure a fair and impartial jury, and have never taken the position that the privilege should be unrestricted. In *Connors* v. *United States*, 158 U.S. 408, 413, 39 L. ed. 1033, 1035, Mr. Justice Harlan said: "It is quite true, as suggested by the accused, that he was entitled to be tried by an impartial jury, that is, by jurors who had no bias or prejudice that would prevent them from returning a verdict according to the law and evidence. It is equally true that a suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is the rule in civil cases, and the same rule must be applied in criminal cases."

This court has also recognized that the scope and extent of the *voir dire* examination rests within the discretion of the court and is subject to reasonable limitation. (*People* v. *DeLordo*, 350 Ill. 148; *People* v. *Robinson*, 299 Ill. 617; *Pennsylvania Co.* v. *Rudel*, 100 Ill. 603.) It has never been suggested that a reasonable limitation on *voir dire* examination operates to deprive a litigant of his right to a jury trial. However, a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently, may constitute reversible error. *People* v. *DeLordo*, 350 Ill. 148.

In *Falter* v. *United States*, 23 F.2d 420, at page 426, Judge Learned Hand, in discussing the conduct of the *voir dire* examination of jurors, stated, "while it is the custom

at common law to allow the parties to cross-examine, there is nothing in this essential to securing a panel free from bias. The length and particularity of the examination of jurors had become a scandal, and required some effective control. So long as the power is exercised with reasonable regard for the rights of the accused, it fulfills the requirements of the law."

The Federal courts generally hold that the designation and empanelling of jurors is within the control of the courts by appropriate rules, subject only to such settled principles of the criminal law as are essential to securing impartial juries. (*St. Clair* v. *United States,* 154 U.S. 134, 38 L. ed. 936; *Pointer* v. *United States,* 151 U.S. 396, 38 L. ed. 208; *Falter* v. *United States,* (2d Cir.) 23 F.2d 420; *Murphy* v. *United States,* (1st Cir.) 7 F.2d 85.) These cases emphasize that the only legitimate function and purpose of the *voir dire* examination is to secure an impartial jury. It was never designed or intended as a means of enabling a defendant to select particular jurors. *Brown* v. *New Jersey,* 175 U.S. 172, 44 L. ed. 119 .

Though, as stated in *Falter,* the selection of an impartial jury does not require that the parties themselves be permitted to examine, this court has recognized and preserved that privilege in Rule 24—1 by providing that the parties or their attorneys shall be allowed a reasonable opportunity to supplement the examination conducted by the court. This is in accord with the early case of *Donovan* v. *People,* 139 Ill. 412, in which we held that counsel had the right to put questions directly to the jurors during their *voir dire* examination. It should be observed, however, that in *Donovan* we relied upon the decision in *Stephens* v. *People,* 38 Mich. 739. Michigan practice now permits the judge, in his discretion, to conduct the entire examination. See: Michigan Court Rule 37, par. 1; *People* v. *Lahey,* 256 Mich. 250, 239 N.W. 254; *People* v. *Hayek,* 243 Mich. 546, 220 N.W. 790; 47 Ill. Bar. Journal 140, 143.

The only positive restriction in Rule 24—1 is that the jurors shall not be examined concerning matters of law or instructions. This is in harmony with the recognition of the proper separate functions of the court and jury and with the decision of this court in *People* v. *Bruner,* 343 Ill. 146, holding that jurors in criminal as well as in civil cases are judges of the facts only and not of the law, and that a statute containing provisions to the contrary is unconstitutional. (Also see: 47 Ill. Bar. Journal 140, 146, and cases cited in f.n. 35, p. 150.) If, as held in *Bruner,* jurors are to be governed in matters of law only by the instructions given by the court, no reason is perceived for questioning them as to legal principles or concepts beyond ascertaining whether or not they are willing to accept and follow the instructions concerning the law of the case. The trial judge was careful to examine each and every juror in that respect in this case.

There is nothing in the constitutional guarantee of the right to a trial by jury which prevents reasonable regulation of the manner in which jurors shall be selected. A rule of court regulating the selection of jurors is valid if it is in harmony with settled principles of law essential to securing an impartial jury. There is nothing in the provisions of Rule 24—1 which prevents such result. By permitting both court and counsel to question prospective jurors as to their competency and qualifications, it gives ample opportunity to discover possible grounds of challenge for cause or facts necessary to an intelligent exercise of the peremptory right.

In the case at bar, counsel for the defendant was afforded full opportunity to examine prospective jurors pursuant to the rule. His failure in many instances to avail himself of the privilege serves only to emphasize the fact that the examination conducted by the court was thorough enough to reveal any facts necessary to show grounds of challenge

for cause or an intelligent exercise of the right to challenge peremptorily. Defendant makes no contention that the jury finally selected was not fair and impartial. His constitutional rights were fully protected and the procedure under the rule did not operate to abridge or deny them.

The judgment of the circuit court of Macon County will be affirmed.

*Judgment affirmed.*